PIERCE-FORDYCE OIL ASS'N v. FARROW. (No. 8067.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 19, 1915. On Motion for Rehearing, Jan. 23, 1915.)

1. MASTER AND SERVANT ☞276—ACTION FOR INJURIES—SUFFICIENCY OF EVIDENCE—NEGLIGENCE.

Evidence in a servant's action for injury from the sudden blowing of a newly installed whistle, making a loud, shrill, unusual noise, frightening a gentle team of mules, so that they started and threw him from a wagon, held to sustain findings of the master's negligence, proximately causing the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. ☞276.]

2. NEGLIGENCE ☞136—QUESTION FOR JURY.

The issues of negligence and of the proximate cause of an injury are nearly always questions for the jury, and never become questions of law, where there is evidence of probative force in support of the issue, and the question of negligence should not be taken from the jury, except where there is no material conflict in the evidence, and where there is no room for doubt or for different minds to draw different inferences.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 277–353; Dec. Dig. ☞136.]

3. NEGLIGENCE ☞58—"PROXIMATE CAUSE."

If an injury follows an act of negligence in natural sequence, without independent intervening cause, and would not have occurred but for the negligence, the wrongdoer, as a matter of law, is held to have had the injury in contemplation, so that the negligence is the "proximate cause" of the injury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 71; Dec. Dig. ☞58.

For other definitions, see Words and Phrases, First and Second Series, Proximate Cause.]

4. TRIAL ☞194—INSTRUCTIONS—WEIGHT OF EVIDENCE—STATUTE.

In a servant's action for injury, where the court submitted the issue as to whether or not the whistle sounded just before the accident occurred was an unusual one, reasonably calculated to frighten an ordinarily gentle team, the court's explanatory words on submitting another issue, "If you find that it was unusual and of such frightening character, your answer to this question will be, 'Yes,' otherwise, 'No,'" was not within Vernon's Sayles' Ann. Civ. St. 1914, art. 1971, forbidding the court to charge or comment on the weight of the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 413, 436, 439–441, 446–454, 456–466; Dec. Dig. ☞194.]

5. DAMAGES ☞132 — EXCESSIVE DAMAGES — INJURY TO FOOT.

A verdict of $2,000 for an injury to the left foot, fracturing one or more of the smaller bones of the foot and one of the bones of the leg, which caused a great deal of pain, suffering, and inconvenience, and which was probably permanent, was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. ☞132.]

Appeal from District Court, Tarrant County; Marvin H. Brown, Judge.

Action by J. E. Farrow against the Pierce-Fordyce Oil Association. Judgment for plaintiff, and defendant appeals. Affirmed.

Smith, Robertson & Robertson, of Dallas, and Thompson & Barwise, of Ft. Worth, for appellant. Carlock & Carlock, of Ft. Worth, for appellee.

BUCK, J. J. E. Farrow, plaintiff in the court below, sued the Pierce-Fordyce Oil Association, defendant, to recover damages on account of personal injuries sustained by the plaintiff while engaged as a common laborer at defendant's refinery.

Plaintiff alleged that he was an employé of the defendant, working as a common laborer; that on July 15, 1912, plaintiff, together with other employés, was engaged in gathering up in barrels quantities of oil that had been spilled from different tanks; that the barrels were transported on a wagon to a tank, and there the oil was removed from the barrels by means of buckets; that the wagon in use was drawn by a team of gentle mules; that plaintiff's duties required him to assist in filling the buckets with oil out of the barrels and to hand the bucket to a man on the tank; that, while he was so engaged, the defendant caused other employés of the defendant to suddenly emit from a whistling device, then erected by defendant,

and which had not theretofore been used by it, an unusual, loud, shrill, and penetrating and deafening noise; that said noise was wholly unexpected by the men at work, and no previous notice had been given to them by the defendant of its intention to make the blast of said whistle at said time; that the said whistle had not been tested out or regulated, so as to be used with reasonable safety and without danger of scaring teams that might be employed about the said plant; and that, by reason of its not having been so regulated, the same was uncontrollable and gave out an unnecessarily large, shrill, and penetrating volume of sound, which was well calculated to frighten teams that might be in or near where the said whistling took place. Plaintiff further alleged that it was negligence on the part of the defendant to cause or permit that whistle to blow at said time, and that, by reason thereof, the team attached to the said wagon, upon which plaintiff was at work, was frightened by said sudden and unusual sound of the whistle, and that it suddenly leaped forward, throwing the plaintiff from the rear of the wagon, spraining his ankle, and breaking one of the bones of his foot. Plaintiff sued to recover damages in the sum of $5,000.

The defendant answered by general demurrer and general denial, and specially answered, denying that the defendant had been negligent in any manner, as charged by plaintiff, and denying that plaintiff had been damaged in any sum for which defendant was responsible, and further pleaded contributory negligence, assumed risk, and that the person responsible for the blowing of said whistle was a fellow servant.

Trial was had before a jury upon special issues submitted to it, and judgment was entered in favor of the plaintiff in the sum of $2,000 upon the verdict of the jury, from which an appeal was perfected to this court.

Appellant in its first and second assignments of error complains that the trial court erred in refusing to give its specially requested instruction No. 1, reading as follows: "You are instructed to return a verdict herein for the defendant, Pierce-Fordyce Oil Association"—for the reason that: First, the evidence was insufficient to support any verdict that the jury might render in favor of the plaintiff; second, for the reason that the evidence was insufficient to show that the blowing of the whistle complained of by plaintiff was the proximate cause of the injury sustained by the plaintiff; third, that the evidence was insufficient to show that the defendant was guilty of any negligence in blowing the whistle and in the manner same was blown when plaintiff was hurt; fourth, because the evidence in the case wholly fails to show that the defendant had been guilty of any negligence proximately causing the injury; fifth, for the reason that it appears from the evidence that the injury sustained by the plaintiff did not result from any failure on the part of the defendant to avert or avoid a peril that an ordinarily prudent person, situated as was the defendant, in view of the facts, would have reasonably anticipated that injury might result as a natural consequence of the blowing of the whistle at the time and under the circumstances that the same was blown. And in its third and fourth assignments of error complaint is made that the evidence was insufficient to support the jury's finding in response to special issue No. 2, wherein the jury found that said accident was proximately caused by reason of the sounding of the whistle then being installed by the defendant in its plant in North Ft. Worth on the date of said accident. And that said finding was contrary to the evidence. These four assignments we will consider together.

The evidence shows: That the whistle then being installed by the appellant was of a large pattern, calculated to give out a very considerable volume of noise, which volume of noise could not be gauged or regulated until the said whistle was tuned or tested and brought into harmony. That the volume and character of noise emanating from said whistle was of such an unusually piercing and threatening character as was reasonably calculated to frighten ordinarily gentle teams that might be in use in the near vicinity of the said whistle, and did in fact frighten the team of mules hitched to the wagon in which plaintiff was engaged in unloading the oil at the time of the accident.

Plaintiff, J. E. Farrow, testified, after giving a short history of his work and employment during several years, prior to the date of his injury, as follows:

"I found work as a day laborer at the Pierce-Fordyce Oil Association. My employment there was varied; some of it was digging ditches. One job I had there, I remember, was digging some brick out there between some walls. I had to do a laborer's job there, and was receiving $2 a day. * * * I had been there, I think, about two months before I got hurt, and had been taken out of the gang, possibly three weeks before this accident occurred, and, after being out there quite a while, I was put on the wagon with a teamster as assistant to the teamster. * * * My work was in connection with the construction of the plant, which was still under construction. At the time I was hurt, there was a whole lot of oil that had been spilled; I don't know how. There was a levee thrown up around one of these iron tanks to prevent oil escaping, and the inside of it had been filled up with oil. We were called to take the wagon up there and get some barrels and get that oil and carry it to a certain tank. * * * Our method of transporting that oil from there to where we put it was that we took buckets and carried it up and put it in the wagon in the barrels on the wagon, and there was a number of us doing that; one or two standing on the wagon and some more dipping oil. * * * It was a flat-bottomed wagon, without siding, and we were working two mules to the wagon. A man named Wiley was driving the wagon at that time, and had been for two or three days. It would be a guess with me as to how far this place where we were getting this waste oil out of the tank was from

the office where the whistle blowed. * * * It would be probably 200 feet from where the whistle was. We had carried a number of loads, possibly four or five or six, before that whistle blew. That whistle blew at 5:40 in the evening. This whistle had never been blown before that. I presume it was a new whistle that had just been installed. Never had seen it and never have seen it yet. * * * During the two months I was there they had never used any whistle, and I did not have any previous notice that there was going to be any whistle sounded. At the time the whistle blew, I was standing on the rear edge of the wagon behind those barrels and moving from the pit where we were getting the oil to the place where we were delivering it. I rode on the wagon each trip with those barrels after one or two. The oil would spill out over the barrels, and Mr. Best came up and asked me would I get something to keep the oil from sloshing out and put it over the barrels. Mr. Best has followed Mr. Luke Mooney as general manager. He directed the loading operations of that oil, and for a few minutes would get us lined out to work, and he came back a number of times to see how we were doing with it. * * * Part of the time I assisted in emptying buckets into the wagon, and part of the time stood on the ground and handed them up. My crew had been working in that particular work something like 2½ hours when I got hurt. It was along up in the afternoon. At the time the whistle blew I was passing up a bucket of oil to one of the other men. There was an iron ladder that ran up alongside of the tank, and a man stood on that ladder, and another man stood up on the top and reached down, and we made a bucket brigade, and when one handed them up another took them and poured them into a tank. * * * We were not able to dip the bucket into the barrel and hand it to a man without getting down upon the ground. You could not empty the barrels and stand elsewhere than on the wagon. * * * At that time the driver and another man were up on the wagon standing just behind me, I think, and there was one man on top of the tank and another one on the ladder. Wiley was the man that had charge of the team. I did not have anything to do with controlling the team at the time this particular work was being done. My work was to help get those buckets to the man. As I recall, at the time the whistle blew I was reaching up to hand a bucket of oil. That whistle sound was loud. It was as loud as any fire alarm I have ever heard. It was something like an Anchor Line steamboat whistle. I have heard whistles at plants before and since. I do not know of any that makes a noise that loud. It was sudden—a shriek. It was a blast. It was like a fire alarm. It was coarse and shrieking, and the effect it had upon the team was that it leaped instantly. They threw me from my balance. I caught at the barrel. The barrel was very near over. It came on over, and I went out the back. A man standing behind me in the wagon was thrown to the ground. The driver was out of my range of vision. After I got to there I could look around. The team ran only a short distance. The wheel, I think, was hung over a piece of iron, or ran into something possibly and stopped."

Mack Berry testified as follows:

"My name is Mack Berry. I am 28 years old, and my occupation is that of a steam fitter. My present occupation is foreman of carpenter work on buildings. * * * I was employed by and working for the Pierce-Fordyce Oil Association in the construction of its plant at North Ft. Worth. My duties were those of general foreman, and under that title I hired and employed men, including the plaintiff, Farrow. My superintendent was Luke Mooney and George Best was assistant superintendent. Best

173 S.W.—64

was actively in charge while Mooney was away. I was blowing the whistle 600 feet from the team that ran away. I was working on the whistle. I had just installed it. I was testing the whistle for the first time. I blew the whistle just before the accident occurred. * * * Mooney directed me to blow the whistle. * * * My purpose in blowing the whistle was to test it and blow it at 5:30, quitting time. I blew the whistle at 5:30. This was the first time the whistle had ever been blown at all. Well, it was a little out of the ordinary, loud for a whistle, and was different from most other whistles in the sound of the blast. It was located over the power house. It made a loud, shrill sound. The whistle had not been adjusted at that time and I was blowing it partly for the purpose of adjusting it. It was greater in volume and penetration than an ordinary or locomotive whistle. No, I do not know of any whistle in this part of the country that are (is) as loud and shrill and penetrating as this one was at that time. No, the superintendent who directed me did not make any inquiries as to whether there was any teams near by to be frightened by the noise. I did not make any investigation myself. No notice was given to the men that the whistle was going to be blown. I did not wait, because I had orders to blow it at 5:30, if I got it up in time. It was hard to adjust. I had to make four adjustments of it before I got it to suit. It had not at that time been tested. * * * I toned it down to their satisfaction after the accident."

W. E. Stovall, witness for the plaintiff, after stating that he was a common laborer in the employ of the appellant, and was working for the appellant at the time appellee got hurt, helping haul oil, testified, in part, as follows:

"I was dipping oil out of barrels and handed it up to other parties on the tank. Farrow was standing right in front of me. I was standing on the back end. Farrow was between me and the driver. * * * It was the whistle that frightened the mules and caused them to jump forward. It was a loud, shrill whistle. It had not been in the habit of blowing. It had not ever before been blown while I was there. I was working there a long time. I think it had just been put up. I did not have any notice that they were going to blow the whistle that evening. As compared to ordinary whistles in use in ordinary plants, this whistle seemed to be pretty loud and shrill."

Geo. E. Best, superintendent, testified in part as follows:

"I know the tank at which Mr. Farrow was working at the time he got hurt. I know the approximate distance from the boiler house up to the turn in the road. It was about 300 feet, or 100 yards. I am certain that it is more than 100 feet. Down to the tank, approximately, after you turn the corner, is about 500 feet. I am certain that it is more than 100 feet. * * * That whistle was installed while I was there. It was installed on the afternoon of July 15, 1912, the day Farrow was hurt. I did not pay much attention to the kind of noise that whistle made when I heard it; the same as an ordinary style of whistle, I call it, that has two cylinders in it, one of those ordinary whistles the same as these manufacturers have. They are all sirens. It did not, to my knowledge make any terrifying noise when it was blown. * * * We put in what we called a fire steam line. We had not installed the whistle, but we were having that done. I do not know the exact men Mr. Berry had helping him; probably had a couple of men. I did not tell him to put it in order. I did tell him to install it. I did not tell him to test the whistle. I expected him to test it when they got it up. * * * I expected

to use it and to try it as soon as I got it in readiness. I did not know that it would be gotten up that afternoon. As soon as it was gotten up, I expected him to try it and get it in working order. I never saw one installed before in my life. I did not give any notice to the men that the whistle was going to be tried out that evening. * * * I was in the office at the time. I do not know where Mr. Berry was. I had a whole lot to do besides watching my men on the yard. I turned that over to him to install the whistle. Installing the whistle meant testing it and putting it in order, and that was part of his work under that direction. I do not really know how many times we had to test that whistle and retest it before we got it toned down sufficiently to be a good working whistle."

W. T. Kirkpatrick, witness for the defendant, testified, in part, as follows:

"I remember the occasion of the installation of the whistle out there. Yes, I know about the installation of that whistle that day. I helped put it up there. Fred Williams, I believe, also helped to put it up there. We worked under the supervision of Mr. Mack Berry. * * * I do not know the name of that whistle, or what kind it was, or whether or not it had a particular name. * * * That whistle is an ordinary steam whistle, double whistle; it has a double bell. A bell is a dome, usually termed a bell. * * * The whistle was on top of the building, and I was standing near the end of the building when I saw the man pull the whistle. He blew the whistle through curiosity, to see what it would sound like. That was necessary. We did not know what tones we would get, and we wanted to get it tested to see what it would be like. Those bells were screwed closer or farther away from the steam in order to adjust it and get your different tones. * * * You cannot tell, without blowing the whistle, what the tone will be. If you screwed one bell on in one position and the other bell in another one, you would first have to try your whistle to see what tones you got before you would know about regulating it, and then either draw it closer or farther away. You would blow the whistle, and, if too close together, you would put them apart; and, if too far apart, you would put them closer together. That is necessary to the installation of all steam whistles of that character. * * * The blast that was given by Berry was a reasonably short blast; just tried to blow it to see what it was going to sound like. It sounded like it was pretty dead; he had it a little too flat."

[1] Enough of the testimony is given above to sustain the finding of the jury, in answer to issue No. 2, that the accident, by reason of which plaintiff suffered the injury complained of, was proximately caused by the sounding of the whistle then being installed by the defendant company, and also the finding, in answer to issue No. 3, that Mr. Best authorized or directed Mack Berry to test or sound the whistle on the occasion in controversy, and further, as found by the jury in answer to issue No. 4, the sound was an unusual one, and one reasonably calculated to frighten any ordinary, gentle team. And further, as found by the jury in answer to issue No. 6, that the sounding of said whistle at said time, under all the circumstances, was negligence on the part of the defendant company.

[2] As held by this court in the case of Bennett v. Railway, 159 S. W. 132, speaking through Chief Justice Conner, the issues of a defendant's negligence and the proximate cause of an injury, on account of which a recovery is sought, are nearly always questions for the jury, and never become questions of law for the court, when there is evidence of probative force in support of the issue. It is well settled that the question of negligence, dependent upon the evidence, should not be taken from the jury, except in cases where there is no material conflict, and where there is no room for doubt or for different minds to draw different inferences from it. The question is one of law for the court only where the facts are such that reasonable men must draw the same conclusion therefrom, and unless the conclusion follows, as a matter of law, that no recovery can be had upon any view that can properly be taken of the facts which the evidence tends to establish.

[3] In Ft. Worth Belt Ry. Co. v. Cabell, 161 S. W. 1085, this court, speaking through Chief Justice Conner, says:

"In several forms it is earnestly insisted that if it be admitted, as there was evidence tending to show, that the appellant railway company was guilty of negligence in either providing defective couplers or in maintaining a defective track, yet such acts of negligence cannot be held to be the proximate cause of appellee's injury, for the reason that such injuries were not such as, in the light of the attending circumstances, ought to have been foreseen as a natural and probable consequence of such act of omission; numerous authorities being cited in support of this contention. The doctrine of 'proximate cause' has been so frequently discussed, and is so well understood, that we cannot hope to add to what has from time to time been clearly stated on the subject in the decisions. There can be no doubt of the general proposition that it is ordinarily an issue for the jury to determine whether, in any given case, an injury similar in character to that under investigation ought to have been foreseen as a result of an act of negligence established by the evidence. If the injury follows the act of negligence in natural sequence, and there is no independent, intervening cause, and the injury would not have occurred but for the act or acts of negligence shown, it meets the requirements of the law. Under such circumstances, the wrongdoer, as a matter of law, is held to have had the result in contemplation. The court gave an approved definition of the term 'proximate cause,' and we think it was for the jury in this case to say whether the acts of negligence shown caused or proximately contributed to cause appellee's injuries, and whether such injuries, or some like injuries, under the attending circumstances, ought to have been foreseen. The jury's verdict on this issue was in appellee's favor, and under the evidence we do not think the verdict can be disturbed."

Many other recent cases might be cited in support of this well-understood and generally accepted doctrine, but we will cite only Wininger v. Railway, 143 S. W. 1152; Little v. Jas. McCord Co., 151 S. W. 835; Railway v. Jackson, 133 S. W. 926; section 1925, vol. 2, Thompson on Negligence (1901 Ed). In view of the evidence in the case and the principles announced in the authorities cited, we are not prepared to hold that negligence on the part of the appellant company was not shown, and that said negligence was not the proximate cause of the injuries complained of,

and therefore said assignments 1 to 4, inclusive, are overruled.

[4] In its fifth assignment appellant complains of the submission by the court of special issue No. 4 of the main charge, wherein the court said:

"If you find that it was unusual and of such frightening character, your answer to this question will be, 'Yes,' otherwise, 'No.'"

This instruction was given in connection with the submission of the issue as to whether or not the whistle that was sounded by Mack Berry just before the accident occurred, was an unusual one, and one reasonably calculated to frighten any ordinarily gentle team. We think that said explanatory words were not improper and not subject to the objection of being upon the weight of the evidence, and indicating in any way the opinion of the court as to whether said whistle was unusual and of a frightening character, and does not contain the vice criticized in the case of Lee v. Yandell, 69 Tex. 37, 6 S. W. 665, cited by appellant, nor is it in conflict with article 1971, Vernon's Sayles' Tex. Civ. Stat., and therefore the fifth assignment is overruled, and likewise the sixth, which involves the same question.

[5] In its seventh assignment of error, the appellant complains that the verdict of the jury was grossly excessive, and alleges certain misconduct of the jury in arriving at the amount of the verdict in that:

"The jury considered the statements and arguments made by jurors in the jury room while the jury were deliberating upon said case, to the effect that, of any amount the jury might award the plaintiff, he would have to pay one-half of the same to his lawyer, and, in arriving at their verdict, the jury awarded plaintiff an amount twice as large to which they thought he was entitled under the instructions of the court and the evidence introduced."

There is no evidence shown in the record, and none adduced in support of the motion for new trial, that sustains the allegation of misconduct of the jury, and we only consider the question as to whether or not the evidence sustains the verdict. We think that the evidence in this case warranted the jury in finding that the plaintiff had sustained a painful and permanent injury to his left foot and leg, fracturing one or more of the smaller bones of the foot and spraining the ankle of the other foot, and also fracturing one of the bones of the leg; that said injuries had caused plaintiff a great deal of pain and suffering and were probably permanent in their nature; and that they were reasonably calculated to cause the plaintiff inconvenience and suffering during the remainder of his life.

Plaintiff testified that he was 45 years of age, and was making, at the labor which he was then following, about $2 per day; that after the accident he was taken to Dr. Duringer's office, where his foot was dressed and the breaks set; that the doctor inclosed it in a plaster of paris cast and wrapped it up; that plaintiff could not bear his weight on his foot at the time; that he suffered very severe pains for a period of several weeks; and that it "hurts to this good hour—hurts bad at night." He further testified:

"When I got up, I think it must have been ten weeks that I went around on two crutches. That cast remained on my foot about four weeks, and after that time there was no other dressing applied to it. I protected myself against injury by holding it up off the ground that way, and wore my sock and no shoe. I was on crutches about ten weeks, or probably longer. Then I got a big walking cane and went with that. I walked with that cane until May, I think, 1913. I went to Groesbeck, where I am now living, and was walking with a cane there, but I did not find it helped me much. I limp yet. I seemed to be getting along about as well without the cane as I did with it, so I discarded it. The shock to my system immediately following the accident and injury was quite intense for some little time. I judge a reaction set up. It grew very painful. It was acute. There is not a night I go to bed that I do not suffer. There is no cold spell or hot spell that does not register itself in that foot. It is not so bad early in the morning. If I am on my feet long during the day it [the foot] turns out and gets painful. The tendons hurt. It hurts now. I have been walking some to-day. There is a projection on the bottom of my little toe—a lump right there. It is painful when I press it. There is a weakness there back of my little toe when I walk on that. There is a protuberance there, probably as much as a small pecan. There is not anything on the other foot to correspond with that. When that comes in contact with any hard substance, I get off as lightly as I can, turning my foot. I walk kind of like that (showing the jury). There is an enlargement in the ankle, that is the left. There is a lack of mobility or stiffness in the joint. * * * I have had that foot to go down with me, not before, but since, the injury. The use of that ankle after I got hurt was painful to me for a number of days—acute pain for several days. Dr. Duringer gave me some kind of an opiate or something he said would ease the pain. After I got so I could bear my weight on it, it was very painful. I tried to work for the Record and was walking, and after December I tried to walk on that foot, and it was swollen, so I had to keep my foot in hot water every night; and it turned blue, and it was painful all day. It is not so painful now, except at times."

Dr. Geo. D. Bond, a physician, testified for the appellant that he made several X-ray pictures of the foot, and that it showed a fracture of the last bone of the left foot and the fifth metatarsal, back of the articulation of the toe; that every bone of the foot is necessary; and that the picture showed distinctly the break or fracture in the fourth metatarsal bone near the end, and also a fracture of what he called the "external malleolus." He further testified that:

"Everything else being equal, the injury to the bones of the foot, after they have apparently healed, and the foot can be used again, gives more inconvenience and pain than injury to bones in any other portion of the body, because they are called on to bear the weight of the body in walking. They are in constant use."

He further testified:

"All the bones that were broken are united. They have grown together, but I do not think that the foot, in its present condition, is in good condition."

Dr. W. E. Chilton, witness for the appellant, testified that he had examined appellee's

foot in November, 1913, the injury occurring in July, 1912, and had found that there had been a fracture of the foot bone and the little toe, what is known as the fifth metatarsal bone, and there was some enlargement of the head of the fourth metatarsal bone. He further testified:

"I should think that it is a fact, by reason of frequent use of the foot, that anything abnormal, where it is an active part, is the occasion of more discomfort and inconvenience and pain than it would be in some other place where you do not have to put your weight on it."

While $2,000 is a substantial recovery, we cannot hold, as a matter of law, that the same is excessive, and therefore appellant's seventh assignment of error is overruled.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

### On Motion for Rehearing.

Appellant, in its motion for rehearing, criticizes the finding and statement of this court as to the nature, extent, and location of the injuries of appellee. It urges that the evidence fails to show that any bones of appellee's leg were broken. Dr. Bond's testimony was to the effect:

That the radiograph of the injured foot, taken by him and exhibited during the trial, showed a fracture. "Picture 200C shows a fracture of what we call the external malleolus; that is, the end of the small bone of the leg. The fracture is across there, but it seems to have reunited. That dark in there shows where the fracture was across there, and the shadow is soft callous."

The appellee testified that Dr. Duringer stated to him that there was a sprain of the ankle of the left foot. In the opinion, this court speaks of the sprain being in the "other foot," to wit, the right foot. It appears we were in error as to which foot was sprained. But the sufficiency of the evidence to sustain the amount of the verdict may rest upon the left foot instead of the right and still be upheld.

Motion for rehearing is overruled.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes